On behalf of the Aquiline, Mr. Frank J. Wyslowski. On behalf of the Aquiline, Mr. Calvin R. Becker. Thank you. Good morning, counsel. Mr. Wyslowski. Good morning. My name is Frank Wyslowski. I'm here this morning on behalf of the American Equine Insurance Group. In the time allotted to me this morning, there's two principal issues in the case that I'd like to take the opportunity to discuss. And I think there are reasons that the trial court's decision should be reversed. The first is that the trial court erroneously based its judgment upon its mistaken belief that the rebuttal witness called by American Equine Insurance Group, in this case Carrie Dickenshine, changed her testimony from her direct examination to her rebuttal testimony. Are you asking this court to make a credibility determination? No, Judge. No, I am not. What I'm suggesting is that the credibility was not the issue here at all. The issue was that the trial court judge just incorrectly recalled what Ms. Dickenshine said. He believed, and he stated both in his, during her rebuttal testimony, the end of her rebuttal testimony, the judge stated that Ms. Dickenshine said during the trial, he said, quite frankly, I don't know about the witness at this point. I'm troubled because I heard her testimony earlier, and she very clearly, she clearly said, we didn't touch this, we didn't use them when referring to the thermostat controls, the radiator controls that were in the premises. During her direct examination and during cross-examination, any of her direct testimony, she didn't testify about the controls or the thermostat use at all. So it's not a credibility issue. It's a fact that Judge Colwell, when he heard the case, he recalled. Was there anybody else who might have said that, that he may have got the names confused, as opposed to being in a situation where no one, not even the witness that you've mentioned, said that? No, I don't believe so. I'm not sure what your answer is. Was there another witness who said this? And I think you said no, there was no one who said that. There was no one who said that. We call three witnesses in the case. We call Kerry Dickenshine, who did not testify with regard to the use of the thermostat controls at all on her direct examination. We also called Doug Panhorst and we called Nancy Fulhorst. They both testified that in the initial time when we were in the tenancy, they tried making the adjustments. It's like a dial that's on the wall, number one to five. And what they would do is they would put it on one, see if that made any difference, put it on two, make any difference. They tried that during the first several months of our occupancy, the tenancy. And when they determined that it wasn't making any difference or adjusting the temperature, they no longer did it. But they initially, they tried doing it and Nancy Fulhorst testified that one of the repairmen who came through advised them that these controls didn't operate the system. So at that point, they just stopped. Ms. Dickenshine never testified that that was the case. And in fact, at the end of the entire case, I asked because quite truthfully, having sat through the entire trial, I was curious as far as how the judge reached the conclusion that he reached. And I asked him and he actually offered. He said that it did end up that Mr. Trumper's client, which was data management, prevailed because I didn't believe a key witness in the case that was called by the other side. Inquiring further, I said, no, at this point, I think that we're done, Judge. You indicated that a significant part of your decision was based on your determination that a key witness presented was not believable. Would it be my understanding that that witness would be Ms. Dickenshine's testimony on the last day? The judge responded, well, I know you're in the appellate court on this case, so I don't think I should make any specifics on mine. Other than the fact that there was a serious credibility issue with one of your witnesses, I think that may be a witness or I think that may be the witness, as I recall today, referring to my reference to Ms. Dickenshine. Reading the transcript from when Judge Cobol was commenting at the end of Ms. Dickenshine's testimony, it was very clear that he had a problem saying that, you know what, she's testifying exactly different than what she said before. And he just recalled wrong. And none of the other witnesses, Judge McClure, testified inconsistently with that. They all testified that when we first moved into the property, we tried making those adjustments and they didn't work. So ultimately that we ended up stopping. The second point that I would like to make in this is that in this case, whether it's the Doctrine of Lanches or the Doctrine of Waiver, it should apply here. What ended up occurring in this case is that just by way of history, there was a case that was filed by American Equine against Dan Management and against Cole Taylor Bank, who is a land trust that owns the property, January 7, 2004. In January, at the end of January, Cole Taylor had been served. In the middle of February of 2004, Dan Management was served. A default judgment was ultimately entered in the case in April of 2005, approximately 15 months later, after Dan Management had filed an appearance and Cole Taylor had filed an appearance. They had come before the trial court, vacated several defaults, had been given several opportunities in order to file an answer. Nothing had ever been filed. So in April 2005, a judgment was entered requiring American Equine to, or if not requiring, allowing American Equine to stay at the property until October 30th of that year on a month-to-month basis for payment of rent and then move out. So American Equine, which is a company… Yes, Judge. The question I have is, at the time you filed your initial complaint against Dan Management and the trustee, Dan Management was in bankruptcy, is that correct? As I understand it now, that is correct. And approximately 14 days or 18 days after the complaint was filed, the bankruptcy was terminated. That's correct. Their discharge was granted. And in the bankruptcy proceeding, your client wasn't listed as having an asset. Your client was totally devoid of having any contact or allegations in the bankruptcy case pleading. That's correct. And I take it, maybe by implication from the record, you weren't aware that Dan Management had filed bankruptcy. No, not at all, Judge. In fact, reviewing the bankruptcy petition, it appeared to be a single creditor bankruptcy. Right. 14 days later, the bankruptcy is terminated and Dan Management apparently still exists, is that correct? At that point, yes. In some fashion. Correct. Creditors are gone or whatever happens to it under the Chapter 7 proceeding. It's not clear from the record. But Dan Management is again a go-home business afterwards. As I understand, they did not file a reorganization. They filed the bankruptcy, but the corporation would continue to exist following the bankruptcy, yes. And then approximately after the termination of the bankruptcy and before January 04, an attorney came in to represent Dan Management and the trustee and attempted to vacate the finding in favor of your client. Well, initially after the complaint was served, an initial default order but not default judgment had been entered. An attorney, Neil Gershon, entered an appearance on August 2, 2004, eight months roughly after the case was filed and six months after Dan Management had been served. At that point, he said, we have a meritorious defense. Give us some time. We'll file an answer. That never happened, so six months later, the default judgment was entered allowing American E-Claim to remain in the property until October 30. And at the time that judgment was entered, there was obviously no further stay of bankruptcy. Correct. Against Dan Management. And I'm talking about the Dan Management, which existed after the bankruptcy termination. That would be correct. And the court, the trial court made a decision that because your complaint was filed while Dan Management was still in bankruptcy, the proceeding was still pending. What was the effect of that? Did it just stay any proceedings on your complaint so that after the bankruptcy was terminated, you had the legal ability to proceed with your cause of action? Cause of action. Or is it as Gershon argued that your complaint was void because it was filed while the bankruptcy was pending? Judge, the result of Judge Colwell's order was that it was void. And I'm asking you, do you agree with that decision? In other words, is by filing a complaint, is the complaint merely stayed pending the finality of the bankruptcy proceeding? Or is it void? Judge, candidly, that result is unclear to me. In the case, we argued that the claims that we were addressing were not claims that could have been brought in the bankruptcy. We were alleging that we had a declaratory judgment action saying, hey, the temperature in this building is bad. It needs to be corrected. Those were not claims that preexisted the filing of the bankruptcy. These were claims that came up after, so they should not have been covered by the stay in the first place. Likewise, the monetary claims were things that occurred after the filing. We didn't believe that based on that, that we should have been stayed in the first place. But the filing against Dan Management would have violated the automatic stay. There's a split in different circuits whether that would be considered a void or avoidable order. In this area, I can't find anything that's clear one way or the other. It would seem to make a difference because if it were a void order and the court made the correct decision for a voidable order, your case would still be going and the effect of the 0-4 order would be maybe you could come in and try to say it's voidable eight months later. But there's a 2-14-01, but it certainly wouldn't be void. I agree, and I don't know that it makes a difference. Okay. Because under the doctrine of, I'm not referring to the disclosures. The reason I say it makes a difference is because your client takes the position that it moved out in reliance on that order. Correct. And if the order was void, it was a mistake to move out in reliance on that order. It could be argued that. Well, I'm certain that it would be argued that that's the case. If it were really voidable, your client has a better position with respect to equitable defenses when it moved out. Judge, I would agree. It absolutely would be better if it's a voidable order. The case that we were discussing at the time that this was decided by Judge Coble was a case out of, I think, either the Third or the Fifth Circuit, I think the Fifth Circuit. And in that case, they made reference to the fact that there's a demarcation between the cases, whether it's a void or a voidable order. Anything from this circuit or anything from the Illinois Supreme Court, I've been unable to find whether it is or, you know, to clarify that issue. Your primary argument is an evidentiary argument. In other words, the court relied on testimony that didn't exist to make its finding. Yes. Absolutely. And it's not a creditability issue. Pardon? And as a result, it's not a creditability issue. He just, he had an error in his memory for an afternoon. Counsel, you said that you're arguing the latches and the waiver, I believe you said, did you not? Yes, I did, Judge. The latches relate specifically to what? The latches relates to the fact that Dan Management sat on their rights. Dan Management knew. Slumbered on their rights, sat on their hands. Sat on their hands. They knew, they knew when the case was filed. They were the agent for this Davis Park Center, which in a minute I'll get to because I don't honestly know what Davis Park Center is. But they sat on their rights. They were the agent for them or for the beneficial or for the land trusted on the property. They knew that we filed. We sent a copy and Mr. Morris. Who's Dan? Who's Dan? Dan Management. I'm sorry, Dan Management. Did the lessor know that you filed? Dan Management was the agent for the lessor, so yes. That knowledge would impute. And likewise, when the order, the default judgment was entered, Mr. Morris Rowland in his affidavit indicated two days after the April 6th order was entered on April 8th, he sent it to Neil Gershon, who was their attorney at the time. So again, knowledge to the agent is going to impute right up. In April, they knew that that order saying we move out in October had been entered. They did nothing. We then sent a letter to both Mr. Gershon and to Dan Management directly at the beginning of September saying, hey, in pursuit of that order, we're moving out. About seven days later, by looking at the billing records, they retained counsel to examine it. That's when the first billing started. 30 days after that, or 35 days after that, they first filed a motion, which was five days before we moved out. We had signed a lease for the new property, had a build out of the new property back in July. This was, you know, three months before this. They sat on a case for 15 months, did nothing. The judgment says the lessors did not waive the lessee's strict compliance with the lease. So your laches argument is not the same thing as your waiver argument, is that correct? Technically, they're not the same. That is correct. Any elements are different. So laches relates to failure to do something prior to the time that your client departed the premises. Is that basically your argument, then, relative to laches? Yes, to our prejudice. Relative to waiver, for purposes of determining whether or not there was a breach of the lease, how does what Dan Management did or didn't do, how does that relate to relieving you of compliance with the lease? Well, by their conduct in coming to court, asking for leave to file an appearance, by their not doing anything for that 15-month period, by them allowing an order to enter, and in theory maybe waiting for the end of the term in order even to bring it back to the court's attention and not even noticing it up for a date that was prior to the day we were going to move out, I think by their conduct it can be inferred that that was a knowing waiver of a right that they had. There was nothing, certainly there was nothing expressed. There was no letter that says, hey, by the way, no problem, we'll let you move out. But totally by their inaction, when they knew all of these circumstances were going on, I think does. Certainly the elements of the two causes are different. It may be a little cleaner fit in latches than waiver, but the substance of both of them is the same, I think. Well, waiver and latches are different. They are. They have different elements. Absolutely they do, but the pivot here is their inaction for the period of time once they knew that this existed. Now, whether it goes back to the date of the complaint or whether it just goes back to the date of the April order, there's still a six-month period where they had noticed through their counsel that these orders had been entered that they had elected to do nothing. Thank you, counsel. You'll have some time for rebuttal. Thank you. Mr. Becker, good morning. Good morning. I'm Alvin Becker. I'm here on behalf of the Apple League. I'd like to thank the court for the privilege of addressing the court. The last time I was here on an oral argument was so long ago I still had hair. But thank you again for inviting us to make an oral argument in this case. If your honors will permit me, I'd like to address my response in a different order than the argument that was presented by counsel for the epilogue and perhaps address some of the questions that were put to counsel by the court. One of the questions put to counsel was the effect of the bankruptcy, the Chapter 7, and the automatic restraining order. As to whether or not any order entered after the filing of a Chapter 7 proceeding or any proceeding under the Act makes any subsequent order in a state court void or voidable. The blue brief, page 30, refers to the Little Texas Bouchon case, a third district case, citing a whole plethora of authority that any action taken makes such an order void. The mere filing of the complaint is void. And in the Bouchon case, not only was the order reversed with direction to the circuit court to dismiss the case because it was filed in violation of the automatic restraining order. It should also be noted that one of the questions put to counsel was whether or not the order was void or voidable. For the purpose of this argument, it is clear that the order was void. A more important question, in my opinion, respectfully, is assuming the order was voidable, giving them the benefit of that doubt, then under Supreme Court Rule 304B, such an order, a voidable order, would have necessarily been a prosecution under 214.01. A 214.01 prosecution under, by virtue of Rule 304B, is immediately appealable on vacature of the judgment or order.  To the extent that that order was void and respectfully, I could not look any judge in the eye and say it wasn't a void, it was void. Then 214.01 need not apply and any of the common procedures to vacate an order is applicable. The simple fact of the matter is that there's never been an attack in this court with respect to whether that order was void or voidable or challenging what Judge Caldwell did with respect to that order. It is to have not appealed that. If I may clarify in my own way, what you're saying is you filed a 214.01. It was granted. There was 30 days to file a notice of appeal. There was no notice of appeal. Therefore, you cannot collaterally attack that finding or that judgment? Yes, I'm saying that, however, Your Honor, we did not file a proceeding which was captioned motion pursuant to 214.01. It was a motion to vacate order. And the theory of the motion that we filed was that the order entered was resulted in the judgment. It was a void judgment. It was void because it was entered in violation of the automatic restraining order. They did not in their appellant's brief in this case or in their reply brief attack the entry of the order vacating that judgment, whether it was a void order or a voidable order. If it was voidable, then, of course, it would have had to have been attacked under Rule 304B within 30 days. But they simply haven't appealed from that. And, therefore, not having appealed from it, the propriety of that order really is not in question. What is in question here is the legal effect of that order. And the legal effect of that order is, in my opinion, that the judgment that was entered was void. Independent of that, Your Honors, one needs to take another look at that judgment order. I apologize for that. A more careful look at that judgment order. And that is the law of civil procedure can sometimes be an esoteric subject. Now, recall that the complaint that was filed was a complaint in three counts. That is the complaint on which the judgment was entered, which was ultimately vacated. If you examine the judgment order that was entered in this case, April 6, 2005, which is C-99 in the record, you will find that that judgment order does not dispose of one of the counts in the complaint. Recall, Your Honors, that one of the counts in the complaint, in addition to the count, that separate count that said that we want relief because the property is untenable and, in effect, it's a constructive eviction. Another count says we want money damages. And a third count says we want relief because they violated our right of first refusal with regard to another suite in the property. That count was not disposed of. It is silent. Respectfully, Your Honors, that unfortunately implicates Supreme Court Rule 304A. What happens when you don't dispose of all of the counts? As the rule very clearly says, such an order is interlocutory. It may be vacated at any time. So to the extent of their claim that they relied on the judgment order of April 6, respectfully, they had no reasonable right to rely on it because it was never a final order. It was an interlocutory order. Going back again to that order, Your Honors, and going back again to the complaint in this case, the complaint attaches as an exhibit an indenture of lease, and the lessor is named as Dan Management as agent for Davis Park Center. So a disclosed agent. Who did they sue in this case? They sued a disclosed agent. A disclosed agent is not suable. Who else did they sue? They sued a land trustee. The land trustee is not a party to the lease. This is not a suit that affects the title. They also, if you look at the judgment order, Your Honor, the order provides that the judgment is entered in favor of plaintiff and against defendant in the sum of $29,000. Respectfully, I as one execute a judgment of $29,000 against defendant when there's two defendants. And that repeats itself throughout the subsequent paragraphs. In paragraph 3, it says defendants have materially breached a lease. And paragraph 5 says the defendant shall maintain the temperature. Is that a foul in that you talked about the judgment that was entered in 04, that suit? This is the judgment respectfully entered April 6, 05, sir. 05? 05. Motion to vacate file later on that year and vacated in February of 2006. That is the order that, one, the judgment order of April 05 was clearly void. Two, whether it was void or voidable, it's not being attacked in this court. And number three, nobody should have had the reasonable right to rely on this order for the reasons that I hope I've made clear to the court. The 05 judgment was entered based on the 04 order. Is that correct? The 05 judgment was entered, sir, based upon the 04 complaint, which had been preceded. The judgment had been preceded by an order. That's a test. It'll last about a minute. It's a test. So just calibrate your speaking. I'm sorry. This happens on a particular Tuesday of the month. It's not a sign from heaven that the lawyer is boring the court. Not at all, sir. Okay. Or some other person. There was a default order, Your Honor, and that order was entered for failure to plead. Counsel. That order, my point is, that order was entered only against dam management, not the court. Correct. Correct. So when you get down to 05. The judgment order. The judgment order. That's correct. Correct. You're now involved in dam management. You still have the trustee. The land trustee. Correct. According to the original complaint. Correct. Can I take 20 seconds and not talk? May I not talk until that stops? Sure. Thank you. Well, it'll keep going. Oh, okay. That's what I said. You can pause and then. I'm sorry. I'm sorry for that. Okay. Going to the first point that counsel made. The circuit court, in this case, made very specific findings of facts and conclusions of law. One of the findings of facts that the circuit court made was, and I don't know how it could have made any other finding of fact was, the lease was kind of like a standard of proof as to what the tenant needed to do in the event that the tenant wanted to say that there's something the matter with the conduct of the lessor with regard to the property concerning that it's too hot in here. One of the things was that you needed to use a calibrated thermometer. And it also imposed upon the tenant the obligation to know and understand and employ the baseboard controls, which have a definite effect upon the temperature within the premises. It was clear, based upon the testimony heard, especially by Mr. Finley, who testified on behalf of the landlord, that the circuit court was empowered to rationally and reasonably conclude, you used this hardware store thermometer, it wasn't calibrated, it wasn't verified for accuracy, and you did not. You did not adjust properly, as you've testified to as a collective, with regard to the baseboard controls. You've testified that you were told, for example, that they weren't functioning, don't use them. Well, in fact, Mr. Finley testified just the opposite. It seems to me very respectfully that is exactly the function that a trier of fact must come to. It's his job, it's his responsibility to determine who he believes and who he doesn't believe. And he clearly made a factual determination here with regard to why it was that the tenant did not sustain his burden of proof with regard to the untenability of the property. Did that clearly, that was his job to do. He had the right to decide who he wanted to believe. He wanted to believe Mr. Finley, and he did believe Mr. Finley, and he made all of those specific findings of fact with regard to what findings of fact he was made based upon the evidence. There is no challenge, as I see it, in the brief made by the appellant with regard to the calibrated thermometer. It's just not made that Mr. Finley's thermometer was, in fact, a calibrated expensive thermometer. It was the one that was verified. It was the one that produced verifiable readings, and that it was the tenant's function and responsibility to deal with the baseboard controls, and the tenant didn't deal with that. And therefore, the tenant loses. Now, one last argument that is made, and there was an observation, it has to do with the rule, the doctrine of waiver. And it seems to me, Your Honor, made an observation, correctly so, that there surely is a distinction between waiver and latches. And I'm only speaking now respectfully with regard to the doctrine of waiver. Waiver had become a shifting target here in this case because in their response, that is, the tenant's response to a motion for summary judgment, which, by the way, was denied, the tenant's response was that waiver exists because the tenant and or his representatives did not adequately instruct, that is, the landlord did not adequately instruct the tenant with regard to the use of the baseboard controls. That is a very different waiver argument that is now being made here. The waiver argument, as I understand, that is being made here is that you waived your right to collect rent or seek a judgment for rent because you didn't file a lawsuit for the rent time. Recall some of my earlier arguments and observations with regard to who were the parties to this case. The fact of the matter is that there was nobody who was a party to this case that when it was filed, through and including the time of judgment, who was bound by that because the landlord was an indispensable party. The landlord was never made a party to this case through and including the entry of that judgment that was vacated that did not occur until they filed an amended complaint many weeks thereafter. Nobody had an obligation to appear in a case that they were not parties to. They timely brought this suit. This was a suit for which the applicable statute of limitations, as we all know, would have been ten years, and it was clearly brought within one year. So to say that there was a waiver is frankly an argument that is not based upon, as I understand, what the law of waiver is, and waiver is they try to change their argument of waiver as the case has progressed through various stages of the proceedings. That concludes my argument. If you have no further questions, which I will try to answer, if not, I should sit down. Well, Davis Park did file a claim on its own for breach of contract. Yes, they filed a separate lawsuit, which was consolidated in the trial of this case. A separate lawsuit filed subsequent to the vacature of the judgment on April 6, 2005. Thank you very much, counsel. Thank you. And I apologize if I was screaming over that. No, no, that's fine. I'm sorry that the circumstances existed to interrupt your argument, counsel. Mr. Wyslowski. Thank you. Thank you. You know, it's interesting that we got to the point about who the correct parties in this case were. And our position is that we had the right parties in the case the whole time. The owner of the property is the land trust. That's who owns the property, the real estate records, nothing shows any difference. Dan Management signed the lease. Dan Management is agent for Davis Park Center. Best I can tell, Davis Park Center is a phantom. It doesn't exist. There is no Davis Park Center. It was pled in Davis Park Center's complaint that they're an Illinois partnership. The evidence presented at trial by Dan DeVorkin, who is the president of Dan Management, said that's a trade name. It's a name that we use to identify that property. There was no testimony presented it was a partnership. It has no interest in this at all. It's a name. It's not a corporation. It's not a limited partnership. It's not an unincorporated association. It has no legal substance. It would have no standing to be before this court other than right now it has a judgment. But I don't know what it is. There would be no way we could serve it. It's not registered under the Illinois Assumed Name Act anywhere. It's just a name that they were using. There's no tax return that they file. I really don't know. Did you ever attempt to serve? No. Did you ever attempt to publish against it? No. Did anybody ever file an appearance in its proceedings on its behalf? There was a complaint filed in the second lawsuit that was consolidated by Mr. Tittner's office and by that office as part of the complaint. But as part of our lawsuit, no. And as best I can tell, I don't know what they are or how they exist. Did you ever make findings as to what the relationship between the lessor and the disclosed agent was so far as alter egos or identity of personalities or persons or anything like that? No. No. No. So as a starting point, I think that that's interesting that that's where we start. Now, with regard to the original default judgment that was entered April 6th of 2005, that judgment referred to defendant, but certainly the parties that had been sued and the parties that had been served at that time included the Lantros. So although there may have been a violation of the automatic stay with regard to dam management, I don't know that that same would apply to Colt Taylor Bank. Was the third count seeking relief based upon a breach of right of first refusal? Was that stricken or dismissed? It was not. With regard to the liability, although it referred to defendant, I would certainly argue that that was in the order joint and several liability between both dam management and between the Lantros. They both appeared in that case at the point. And, you know, there's a Scribner's error with regard to singular or plural. There was no reference in the order, and I would suggest that it would refer to both. Now, with regard to the controls, the transcript in the court heard a lot of testimony in this case about what happened in as far as repair bills. And certainly there were a number of complaints that were made, and dam management companies sent out people in order to go correct problems with the heating and ventilating system. And, you know, every time they were out there, they found something that was wrong to fix. And they found something that they could bill, and it was either paid for by dam management or passed along to the tenant. But if you review the bill, still was more than $35,000 worth of charges to correct the heating system. None of the bills, none of the testimony indicates that somebody came out and said, guys, this is really easy. All you have to do is turn the little knob on the wall and look, the system works. None of the bills make reference to the fact that there were problems with it. In fact, I asked Dan during his examination if one of his repair people had gone out or one of his service people had gone out and found that the condition of the property was significantly different or was different than what the tenant was reporting. Would they have told you? And he says, yeah, they would have made mention. That would have been their job. And there's no reference to that either. So when the people went out, there was a problem. Now, there is some, you know, consularity that, well, what the judge did is he believed Mr. Finley. Historically, the way this worked, Mr. Finley came in at the very end. Mr. Finley was not even involved in the property until after the default judgment had been entered. They went through three different repair companies that they were using to come out. They had a couple of service people who came out. And finally, the judge said, you know, we're going to put a handyman out there. Mr. Finley will be the person. And supposedly, two and a half years or three years into the leases, when he first would have instructed our people how to use these dials, that nobody ever complained had been improperly adjusted in the first place. Thank you very much. Thank you. At this time, the court will take the matter under advisement and render a decision.